AO 91 (Rev. 11/11) Criminal Complaint　　　　　　　　　　　　　　　　AUSA Saqib Mohammad Hussain (312) 353-1414

FILED
7/15/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| UNITED STATES OF AMERICA | CASE NUMBER: 25 CR 395 |
|---|---|
| v. | |
| GERARDO IBARRA | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on or about March 19, 2025, and continuing until at least on or about May 22, 2025, at Chicago, Illinois, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Sections 841(a)(1) and 846 | did conspire to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

　X　Continued on the attached sheet.

*Jeffery T. Van Der Mark*
JEFFERY T. VAN DER MARK
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: July 15, 2025

*Judge's signature*

City and state: Chicago, Illinois

JEANNICE W. APPENTENG
U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, JEFFERY T. VAN DER MARK, being duly sworn, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), and have been so employed since May 2024. My current responsibilities include the investigation of federal firearms offenses, including the unlawful possession of firearms or ammunition by convicted felons, firearms and narcotics trafficking, and violent crime.

2. Prior to becoming a Special Agent, in approximately September 2016, I joined the Detroit Police Department as an officer and later joined the Grosse Pointe Farms Department of Public Safety in approximately June of 2018, resulting in eight years of law enforcement experience. I have gained experience in federal firearms and narcotics investigations and have been involved with various electronic surveillance methods. I have also participated in investigations that have led to the issuance of search and arrest warrants involving violations of narcotics and firearms laws.

3. This affidavit is submitted in support of a criminal complaint alleging that Gerardo IBARRA has violated Title 21, United States Code, Sections 841(a)(1) and 846. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging IBARRA with conspiring to possess with intent to distribute and distribute a controlled substance, I have not included each and every fact known to me concerning this

investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

4. This affidavit is based on my personal knowledge, my training and experience, my review of audio and audio-video recorded conversations, law enforcement records and reports, court documents, as well as other information provided to me by other law enforcement agents and confidential sources.

A. Summary

5. As set forth in further detail below, IBARRA worked with Co-Conspirator A to supply individuals who, unbeknownst to them, were undercover ATF agents (UCO-1 and UCO-2; collectively, "the UCOs"), with firearms and cocaine. On May 14 and May 22, 2025, IBARRA supplied Co-Conspirator A with the cocaine Co-Conspirator A sold to the UCOs. On June 23, 2025, IBARRA admitted to law enforcement during an audio-video recorded interview that he provided Co-Conspirator A with the cocaine for the May 14 and 22 transactions, and other controlled transactions between Co-Conspirator A and the UCOs.[1]

---

[1] In addition to the March 19, May 14, and May 22 controlled purchases described in this affidavit, the UCOs conducted approximately five additional in-person controlled purchases of firearms and/or narcotics with Co-Conspirator A between in or around March 2025 and in or around June 2025. During IBARRA's June 23, 2025 audio-video recorded statement, IBARRA admitted to participating in these unlawful firearms and narcotics sales—either as a direct participant delivering the firearms and narcotics, or as a "look out" for Co-Conspirator A.

**B.     March 19, 2025: During a Controlled Sale of Firearms to UCO-1, IBARRA Stated He Could Sell Cocaine to UCO-1.**

6.     As set forth below, on March 19, 2025, Co-Conspirator A sold UCO-1 three AR-style pistols and one AR-style short-barrel rifle. Co-Conspirator A arranged for the sale using his phone ("Co-Conspirator A's Phone")[2], and directed IBARRA to deliver the firearms to and accept payment from UCO-1 on Co-Conspirator A's behalf.

7.     Specifically, on March 19, 2025, at approximately 8:25 a.m., UCO-1, posing as a friend of a confidential source who previously purchased firearms from Co-Conspirator A, texted Co-Conspirator A on Co-Conspirator A's Phone and asked, "How much u offer me for Ak [an assault rifle-style firearm]."[3] Co-Conspirator A replied "A lil over stack [$1,000]." Co-Conspirator A then stated that he "is about to get these 4 sticks [firearms] today [March 19]" and stated, "Ars [assault rifle-style firearms] I can get them all day." UCO-1 and Co-Conspirator A exchanged several

---

[2] This affidavit refers to Co-Conspirator A as the identified user of Co-Conspirator A's Phone based upon (1) law enforcements review and comparison of Co-Conspirator A voice on Co-Conspirator A's Phone to Co-Conspirator A's voice during audio-video recorded, in-person controlled purchases between UCO-1 and Co-Conspirator A on approximately seven different occasions, and (2) Co-Conspirator A selling firearms of the same type for the same price that the user of Co-Conspirator A's Phone agreed to sell UCO-1 prior the controlled buys.

[3] Certain conversations referenced in this affidavit have been recorded and preserved. This affidavit does not notate every communication between Co-Conspirator A and UCO-1. Instead, the conversations are summaries of the communication. Where recorded conversations are discussed in this affidavit, the language that is quoted from the recorded conversations is based upon a preliminary review of the recorded conversations and not on final transcripts of the recorded conversations. Summaries and excerpts do not include all statements or topics covered during the course of the conversations. At various points in the affidavit, I have also included, either in brackets or summary form, my interpretation of words and phrases used in conversations. My interpretations are based on the contents and context of the conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

more messages in which Co-Conspirator A agreed to sell UCO-1 the assault rifle-style firearms. UCO-1 then coordinated a meeting at "lawndale and 85," which Co-Conspirator A, using Co-Conspirator A's Phone, responded, "Yeah that's my crib ("Co-Conspirator A's Residence")."[4]

8. Prior to UCO-1's arrival at Co-Conspirator A's Residence, law enforcement conducting surveillance observed Co-Conspirator A retrieve a black bag from a white Jeep Cherokee bearing registration number CS 55628 ("Co-Conspirator A's Jeep") parked in front of Co-Conspirator A's Residence. According to Illinois Secretary of State records, Co-Conspirator A's Jeep is registered to Co-Conspirator A at Co-Conspirator A's Residence. Co-Conspirator A carried the bag to a black Nissan Kicks vehicle bearing Illinois registration EE25602 ("Vehicle 1") parked nearby.

9. At approximately 4:05 p.m., UCO-1 drove to the agreed meetup location near Co-Conspirator A's Residence. UCO-1 was equipped with a concealed audio and video recording device as well as an electronic transmitter.

10. At approximately 4:07 p.m., UCO-1 received a phone call from Co-Conspirator A, who was using Co-Conspirator A's Phone, in which Co-Conspirator A explained he was sending his "brother" out to meet with UCO-1 because Co-Conspirator A had to leave but should return in about ten minutes.

11. Shortly thereafter, UCO-1 observed a heavy-set Hispanic male, later identified as Gerardo IBARRA (*see infra* paragraphs 15-16), exit the driver's side door

---

[4] On June 23, 2025, law enforcement searched Co-Conspirator A's Residence pursuant to a court-authorized warrant under case number 25 M 388.

of Vehicle 1 while carrying what appeared to be the same black bag that Co-Conspirator A had brought to Vehicle 1 minutes earlier.

12. UCO-1 observed IBARRA carry the black bag to the passenger side of the undercover vehicle ("UCV") and open the door. According to UCO-1, upon opening the door, IBARRA handed UCO-1 the black bag, which contained three AR-style pistols and one AR-style short-barrel rifle.[5] After looking over the firearms, UCO-1 handed IBARRA $6,000 in prerecorded funds for the firearms.

13. As IBARRA counted the money, UCO-1 asked IBARRA whether UCO-1 could purchase "work" [cocaine]. In response, IBARRA stated, "some jale [cocaine]?" UCO-1 replied, "Yeah." IBARRA then stated that the "jale" would come from IBARRA and that if Co-Conspirator A had told IBARRA that UCO-1 wanted "jale," IBARRA would have brought a sample that day for the UCO-1.

14. Based on my training and experience and the training and experience of other law enforcement officers familiar with investigating narcotics trafficking, I know the term "jale" is a Spanish slang word for cocaine and that in the above exchange between UCO-1 and IBARRA, IBARRA told UCO-1 that IBARRA can sell UCO-1 cocaine and would have brought a sample of cocaine to the March 19 transaction had Co-Conspirator A told IBARRA to do so.

---

[5] Based on my training and experience and the training and experience of law enforcement officers familiar with the identification of firearms, the AR-style firearms appear to be privately made firearms because they lack serial numbers on the lower receivers.

15. After the March 19 transaction, UCO-1 was shown an Illinois driver's license photograph of IBARRA. UCO-1 confirmed the heavy-set Hispanic male who conducted the firearms transaction on March 19 was IBARRA.

16. Following the March 19 firearms transaction, UCO-1 exchanged a series of text messages with Co-Conspirator A, who was using Co-Conspirator A's Phone. In summary, UCO-1 apologized to Co-Conspirator A for being late to the March 19 deal and confirmed that UCO-1 gave Co-Conspirator A's "brother" [IBARRA] the $6,000. In response, Co-Conspirator A, replied, in sum, that UCO-1 being late was no problem, and then offered the UCO additional ammunition by stating, "Let me know if u need ammo."

### C. May 14, 2025: IBARRA Supplied Co-Conspirator A with Cocaine for Sale to the UCOs.

17. As set forth below, on May 14, 2025, UCO-1 and Co-Conspirator A arranged to meet at approximately 4:00 p.m. that day near the intersection of 51st Street and Kolmar Avenue in Chicago to complete a controlled purchase of (a) an assault rifle-style firearm, an UZI-style firearm, and multiple pistols, including a Glock 43X with an aftermarket red metal magazine release, for $9,000, and (b) approximately 9 ounces of cocaine for $7,000.

18. Law enforcement conducted physical surveillance of Co-Conspirator A's Residence prior to the deal. At approximately 3:11 pm, law enforcement observed Co-Conspirator A exit Co-Conspirator A's Residence and enter Co-Conspirator A's Jeep. At approximately 3:33 pm, Co-Conspirator A was observed driving away from his residence in Co-Conspirator A's Jeep.

6

19. At approximately 4:03 pm, UCO-1 and UCO-2 arrived at the intersection of 51st Street and Kolmar Avenue. UCO-1 and UCO-2 were equipped with concealed audio-video recording devices during the transaction. Shortly thereafter, UCO-1 received a text message from Co-Conspirator A, utilizing Co-Conspirator A's Phone, stating he was "pulling up." At approximately 4:07 p.m., law enforcement surveillance and the UCOs observed Co-Conspirator A arrive in Co-Conspirator A's Jeep, which he parked behind the UCV.

20. According to the UCOs and law enforcement surveillance, Co-Conspirator A exited Co-Conspirator A's Jeep, spoke with the UCOs, and carried a firearm wrapped in a Home Depot cardboard box to the rear of the UCV. According to the UCOs and the audio-video recording, Co-Conspirator A unwrapped the cardboard box and told the UCOs "this is the AR," which the UCOs observed to be an assault rifle. Co-Conspirator A then went back to Co-Conspirator A's Jeep and returned to the UCV with a bag of magazines for the rifle and an UZI rifle wrapped in a camouflage blanket, all of which Co-Conspirator A placed inside the UCV.

21. According to the UCOs and footage from the audio-video recording, Co-Conspirator A then told UCO-2, "I was telling this guy [UCO-1], I'm gonna give you [UCO-2] these three then the other three." Co-Conspirator A then asked, "Can you do five [$5,000] right now and give me like fifteen minutes?" In response, UCO-2 asked, "pay for the guns?" Co-Conspirator A stated, "No, pay me for the work [cocaine]."

22. Based on my training and experience, the training and experience of other law enforcement officers familiar with investigating firearms trafficking, and

7

my familiarity with the investigation to date, I believe that Co-Conspirator A told the UCOs that he had three more firearms and cocaine to give the UCOs as part of the agreed on transaction. Co-Conspirator A then asked for $5,000 from the UCOs so that Co-Conspirator A could pay IBARRA for the cocaine and retrieve the cocaine from IBARRA to sell to the UCOs.

23. UCO-2 then asked Co-Conspirator A, "How far is it [how long will it take for Co-Conspirator A to get the cocaine to sell to the UCOs]?" Co-Conspirator A replied, "Right down the street, he [IBARRA] doesn't trust me though." UCO-2 then suggested that Co-Conspirator A use the money he made from selling the UCOs the guns to obtain the cocaine from IBARRA. UCOs then observed Co-Conspirator A using Co-Conspirator A's Phone to send a text message. UCO-2 then told Co-Conspirator A to bring the other three firearms, and the UCOs would pay Co-Conspirator A for the guns. Co-Conspirator A agreed.

24. Co-Conspirator A exited the UCV's vehicle, walked back toward Co-Conspirator A's Jeep, and then shortly thereafter returned with three other firearms and a gun box. One of the pistols Co-Conspirator A brought to the UCV was a Glock 43X with an aftermarket red metal magazine release.

25. Co-Conspirator A entered the UCV, and the UCOs began the process of paying Co-Conspirator A for the firearms. At approximately 4:14 pm, the UCOs observed Co-Conspirator A speaking with someone on his cellular phone and heard Co-Conspirator A say "Okay, I'll be there right now," before the call ended.

26. According to T-Mobile toll records, Co-Conspirator A, using Co-Conspirator A's Phone, called IBARRA, who was using phone number (312) 806-8940 (the "IBARRA Phone")[6] at approximately the same time that the UCOs saw Co-Conspirator A use his cellular phone to tell an individual on the other line that Co-Conspirator A would "be there right now."

27. UCO-1 asked Co-Conspirator A if he wanted the UCOs to take him where he needed to go to get the cocaine. Co-Conspirator A responded, "Can you pay that first?" which the UCOs understood to mean pay for the firearms. The UCOs agreed, and UCO-2 provided a total of $9,000 in prerecorded funds to Co-Conspirator A for the firearms.

28. After Co-Conspirator A had completed counting the money he received for the firearms, Co-Conspirator A asked the UCOs, "So you guys gonna wait here?" The UCOs agreed, and Co-Conspirator A stated, "I'm gonna go grab it [cocaine]." The UCOs explained that they would leave the area until Co-Conspirator A had the cocaine and would then return. Co-Conspirator A responded, "That's cool, give me like fifteen minutes." At approximately 4:17 pm, Co-Conspirator A exited the UCV, and the UCOs watched as he re-entered Co-Conspirator A's Jeep and drove south on Kolmar to Archer.

---

[6] Law enforcement identified the IBARRA Phone as belonging to IBARRA based on (a) IBARRA listed as the registered subscriber for phone number (312) 806-8940 and (b) during IBARRA's June 23, 2025 audio-video recorded statement with law enforcement, IBARRA acknowledged that the IBARRA Phone was his and that he used it to communicate with Co-Conspirator A during Co-Conspirator A's sales of cocaine and firearms to the UCOs.

29. Law enforcement surveillance followed Co-Conspirator A, who was driving Co-Conspirator A's Jeep, and observed the Jeep park in the lot of 5114 South Knox Avenue in Chicago. At approximately 4:24 pm, law enforcement observed a heavy-set Hispanic male, matching the physical appearance of IBARRA, drive Vehicle 1 and park next to Co-Conspirator A's Jeep. The male, believed to be IBARRA, was observed to exit Vehicle 1 and hand Co-Conspirator A a bag before re-entering Vehicle 1 and departing the area.

30. According to T-Mobile toll records, Co-Conspirator A, using Co-Conspirator A's Phone, and IBARRA, using the IBARRA Phone, communicated with each other shortly before law enforcement observed IBARRA hand Co-Conspirator A the bag.

31. According to historical location information obtained from T-Mobile pursuant to a court-authorized warrant, the IBARRA Phone used the same cell tower and sector as Co-Conspirator A's Phone during the approximate time that law enforcement observed Co-Conspirator A retrieve the cocaine from the male Hispanic believed to be IBARRA.

32. Law enforcement observed Co-Conspirator A return to 5101 South Kolmar Avenue to meet the UCOs. UCO-1, who was standing outside the UCV, was handed a box by Co-Conspirator A. Co-Conspirator A and UCO-1 then entered the UCV. UCO-1 opened the box and observed a white substance and commented that it appeared to be fresh. UCO-1 told Co-Conspirator A, "I'm gonna have to call your brother [IBARRA], why he is trippin'?" Co-Conspirator A agreed and told the UCOs,

"I know, I'm the one doing everything!" The UCOs then paid Co-Conspirator A $7,000 for the cocaine.

33. Based on my training and experience, the training and experience of other law enforcement officers familiar with investigating firearms and narcotics trafficking, and my familiarity with the investigation to date, I believe that in this exchange between UCO-1 and Co-Conspirator A, UCO-1 told Co-Conspirator A that UCO-1 should call IBARRA and tell IBARRA to allow Co-Conspirator A to keep the cocaine with Co-Conspirator A so that Co-Conspirator A did not need to put in the extra effort of retrieving the cocaine from IBARRA for the narcotics deal.

34. At approximately 4:33 pm, in the UCV, Co-Conspirator A and the UCOs continued to discuss the prices of cocaine, specifically the future purchase of a kilogram of cocaine. After some discussion of cocaine prices charged by other suppliers, Co-Conspirator A advised that he and his brother [IBARRA] would charge the UCOs approximately "18," [$18,000] for the entire kilogram of cocaine.

35. Shortly after, Co-Conspirator A then exited the UCV, entered Co-Conspirator A's Jeep and left the area. Below are the items sold to the UCOs by Co-Conspirator A during this deal.

11



36. ATF sent the white powdery substance contained in the box Co-Conspirator A sold to the UCOs to a DEA forensic laboratory. According to a DEA laboratory report, the white powdery substance weighed approximately 267.6 grams and contained cocaine.

37. Based on my training and experience, the training and experience of law enforcement officers familiar with firearms and narcotics trafficking, and my familiarity with the investigation, I believe that IBARRA drove Vehicle 1 to the May 14, 2025 meetup between Co-Conspirator A and the UCOs in order to give Co-Conspirator A the cocaine that Co-Conspirator A sold to the UCOs. As set forth in Part E below (*see infra* paragraphs 50 – 51), IBARRA confirmed that he supplied Co-Conspirator A with the cocaine for the May 14 transaction.

**D. May 22, 2025: IBARRA Gave Cocaine to Co-Conspirator A, Who Sold It and Firearms to UCOs.**

38. As set forth below, on May 22, 2025, the UCOs again met with Co-Conspirator A outside of Co-Conspirator A's Residence after Co-Conspirator A contacted UCO-1 and offered to sell UCO-1 multiple firearms. UCO-1 agreed and

also ordered approximately four and a half ounces (126 grams) of cocaine for $3,600.

39. On May 22, 2025, at approximately 4:57 pm, the UCOs drove in the UCV to the area of 85th Street and South Central Park Avenue in Chicago and parked around the corner from Co-Conspirator A's Residence. UCO-1 and UCO-2 were each equipped with a concealed audio and video recording device as well as an electronic transmitter.

40. UCO-1 texted Co-Conspirator A on Co-Conspirator A's Phone and said that UCO-1 was by Co-Conspirator A's Residence. Co-Conspirator A advised that he was on his way.

41. At approximately 4:59 pm, law enforcement surveillance observed Co-Conspirator A drive a Chevy Silverado and park near Co-Conspirator A's Residence. According to Illinois Secretary of State record, the Silverado ("Co-Conspirator A's Truck") is registered to Co-Conspirator A at Co-Conspirator A's Residence. Law enforcement then observed Co-Conspirator A enter Co-Conspirator A's Residence and noted Co-Conspirator A was not carrying any items. Co-Conspirator A was observed exiting Co-Conspirator A's Residence a short time later with a black backpack. Law enforcement then observed Co-Conspirator A enter Co-Conspirator A's Truck with the bag and then drive around the corner, parking behind the UCV on South Central Park Avenue just south of 85th Street.

42. UCOs and surveillance observed Co-Conspirator A exit Co-Conspirator A's Truck with the above-described black backpack and give this bag to the UCOs. The UCOs opened this bag and found it to contain one CBC .22 caliber pistol, and one

13

personally made firearm (PMF), a suspected Polymer 80, 9-millimeter semi-automatic pistol. The UCOs also observed a clear plastic bag containing numerous rounds of .22 caliber ammunition inside the black backpack. The UCOs paid Co-Conspirator A approximately $2,000 in prerecording funds for the firearms.

43. Co-Conspirator A then advised that the cocaine would take approximately 15 minutes as his "brother" [IBARRA] was on his way. The UCOs observed Co-Conspirator A get in Co-Conspirator A's Truck and drive away.

44. According to cellular phone toll data obtained pursuant to court order, Co-Conspirator A on Co-Conspirator A's Phone and IBARRA on the IBARRA Phone, exchanged a series of calls and text messages around the time Co-Conspirator A represented to the UCOs that his "brother" was 15 minutes away with the cocaine.

45. According to historical location information obtained from T-Mobile pursuant to a court-authorized warrant, Co-Conspirator A's Phone and the IBARRA Phone Co-Conspirator A used the same cell tower and sector nearest to the deal location and Co-Conspirator A's Residence at approximately the same time that the deal was taking place.

46. At approximately 6:12 p.m., Co-Conspirator A contacted UCO-1 and advised that he had the cocaine. The UCOs then returned to the area of 85th Street and South Central Park Avenue around the corner from Co-Conspirator A's Residence and met with Co-Conspirator A at approximately 6:30 p.m., where they purchased approximately 120 grams of cocaine from Co-Conspirator A in exchange for $3,000 in prerecorded funds.

47. According to law enforcement reports, the white powdery substance contained in the package Co-Conspirator A sold to the UCOs on May 22, weighed 119.7 grams and field-tested positive for the presence of cocaine.

48. Based on my training and experience, the training and experience of law enforcement officers familiar with firearms and narcotics trafficking, and my familiarity with the investigation, I believe that IBARRA drove to the May 22, 2025 meetup between Co-Conspirator A and the UCOs in order to give Co-Conspirator A the cocaine that Co-Conspirator A sold to the UCOs.

49. As set forth in Part E below (*see infra* paragraphs 50 – 51), IBARRA confirmed that he supplied Co-Conspirator A with the cocaine for the May 14 transaction.

E. **June 23, 2025: IBARRA's Audio-Video Recorded Interview.**

50. On June 23, 2025, during a search of IBARRA's residence pursuant to a court-authorized warrant, IBARRA agreed to speak with law enforcement officers.

51. At the beginning of the interview, IBARRA was advised of his *Miranda* rights and agreed to speak with law enforcement officers. I was present at the interview and reviewed the recording. During the interview, IBARRA admitted that he gave Co-Conspirator A the cocaine that Co-Conspirator A sold to the UCOs on May 14 and May 22, 2025. IBARRA further admitted that he has worked with Co-Conspirator A since the March 19, 2025 transaction to supply Co-Conspirator A with cocaine and firearms, and continued to work with Co-Conspirator A to supply Co-Conspirator A with cocaine and firearms through in or around June 2025. IBARRA

also acknowledged that he communicated with Co-Conspirator A using the IBARRA Phone during the firearms and narcotics transactions.

### F. CONCLUSION

52. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that, beginning no later than on or about March 19, and continuing until at least on or about May 22, 2025, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, Gerardo IBARRA, did conspire with others, namely, Co-Conspirator A, to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance.

FURTHER AFFIANT SAYETH NOT.

*Jeffery T. Van Der Mark*
JEFFERY T. VAN DER MARK
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

SWORN TO AND AFFIRMED by telephone on July 15, 2025.

Honorable JEANNICE W. APPENTENG
United States Magistrate Judge